IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KATHRYN MARY OSHMAN,** | : | Civil No. 1:22-CV-1047 |
| **Plaintiff** | : | |
| v. | : | (Magistrate Judge Carlson) |
| **KILOLO KIJAKAZI,** **Acting Commissioner of Social Security** | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

**I.  Introduction**

This case presents us with a recurring procedural dilemma in some Social Security appeals, a procedural conundrum which can have real world consequences for disability claimants. Specifically, we are presented in this appeal with a disability claimant, Kathryn Oshman, who undeniably suffers from a constellation of significant mental impairments, yet who chose to represent herself in her second Social Security disability hearing.

Such mentally impaired *pro se* claimants present special challenges. Recognizing the non-adversarial nature of these hearings, it was incumbent upon the Administrative Law Judge (ALJ) to address the case of this mentally impaired *pro se* claimant with scrupulous care and attention ensuring both that Oshman made a

knowing and intelligent decision to waive the assistance of counsel while also guaranteeing that Oshman's choice did not result in undue prejudice to this claimant.

As discussed below, despite a conscientious effort by the ALJ we cannot find that Oshman knowingly and intelligently waived counsel, and it is evident that the failure to proceed without the benefit of counsel potentially prejudiced consideration of this claimant's case. Therefore, we will remand for further proceedings in this matter.

## II.     Factual Background and Procedural History

We most assuredly do not write upon a blank slate in this case. Quite the contrary, this is Oshman's second Social Security appeal, albeit the first appeal which this mentally impaired claimant endeavored to litigate without the benefit of counsel.

In her initial Social Security appeal Oshman was represented by counsel. Aided by counsel Oshman obtained a favorable outcome in this initial appeal. The factual backdrop of Oshman's case, however, highlighted the severity and significance of her mental impairments. This mental health background also underscored why Oshman needed the assistance of skilled counsel to navigate the complexities of the Social Security system.

As we explained in May of 2019:

Kathryn Oshman has long suffered from a schizoaffective disorder. For Oshman, the symptoms of this impairment have been both persistent and profound. As early as 1992, Oshman was diagnosed with schizoaffective disorder. (Tr. 309.) By 1995, Oshman was hospitalized as a result of this schizoaffective disorder. (Tr. 673-75.) At that time, she was agitated, was voicing suicidal ideation, and made threats against her spouse and children. According to her treating mental health care givers, Oshman's Global Assessment of Functioning, or GAF, score upon admission was 25 and upon discharge was 40.

These were clinically significant findings as they related to the severity of Oshman's condition since:

> A GAF score, or a Global Assessment Functioning scale, was a psychometric tool which took into consideration psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision*, 34, Washington, DC, American Psychiatric Association, 2000. ("DSM-IV-TR"). In this regard, GAF scores "in the range of 61–70 indicate 'some mild symptoms [of depression] or some difficulty in social, occupational, or school functioning.' Diagnostic and Statistical Manual of Mental Disorders ('DSM IV') 34 (American Psychiatric Assoc. 2000). GAF scores in the 51–60 range indicate moderate impairment in social or occupational functioning." Cherry v. Barnhart, 29 Fed.Appx. 898, 900 (3d Cir. 2002). DaVinci v. Astrue, 1:11-CV-1470, 2012 WL 6137324 (M.D. Pa. Sept. 21, 2012) report and recommendation adopted, Davinci v. Astrue, 1:11-CV-1470, 2012 WL 6136846 (M.D. Pa. Dec. 11, 2012). "A GAF score of 41–50 indicates 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).' DSM–IV at 34. A score of 50 is on the borderline between serious and moderate symptoms." Colon v. Barnhart, 424 F. Supp. 2d 805, 809

3

(E.D. Pa. 2006). See Shufelt v. Colvin, No. 1:15-CV-1026, 2016 WL 8613936, at *2 (M.D. Pa. Sept. 15, 2016), report and recommendation adopted sub nom. Shulfelt v. Colvin, No. 1:15-CV-1026, 2017 WL 1162767 (M.D. Pa. Mar. 29, 2017). A GAF score of 31-40 signifies some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. A GAF scores as low as 30 typically indicate behavior that is considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or an inability to function in almost all areas. *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision*, 34, Washington, DC, American Psychiatric Association, 2000. ("DSM-IV-TR").

Jones v. Colvin, No. 1:16-CV-1535, 2017 WL 4277289, at *2 (M.D. Pa. Sept. 25, 2017), report and recommendation adopted sub nom. Jones v. Berryhill, No. 1:16-CV-1535, 2017 WL 4314572 (M.D. Pa. Sept. 27, 2017). Thus by 1995, Oshman's clinical assessment described her mental health condition in terms that signified "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood [and] indicate behavior that is considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or an inability to function in almost all areas." Id.

These severe impairment persisted over time. In May of 2002, Oshman was involuntarily committed after she became increasingly violent, paranoid, and was experiencing suicidal thoughts. (Tr. 609-10.) Two months later in July of 2002, Oshman was seen and admitted for in-patient care after she reported being paranoid at home and stated that she was considering harming herself. (Tr. 602-03.) Five years later in May of 2007, Oshman was again admitted for five days of psychiatric observation. At the time of her admission, her GAF score was 30 and upon discharge her score was 50, scores which were consistent with severe to moderate psychological symptoms. (Tr. 322.)

4

> Consistent with this treatment and diagnosis history, Oshman and her son also described the on-going and profound psychological symptoms she was experiencing as persistent, severe and disabling. At the time of her disability hearing in March of 2017, Oshman reported auditory hallucinations, stating that she "hear[s] voices sometimes," (Tr. 44), and described treatment she was receiving for her "suicidal tendencies." (Tr. 45.) Oshman's son confirmed the gravity of her condition in a third party report submitted to the ALJ. (Tr. 238-45.) In this report, he corroborated Oshman's suicidal ideation, as well as her intense paranoia, which had not responded to extensive treatment over many years. (Id.)
>
> The medical opinion evidence in this case also confirmed that Oshman suffered from severe emotional impairments that remained on-going in 2015 at the time of her disability application. As the ALJ acknowledged, in May of 2015, a state agency expert "Frank Mrykalo, Ed.D., opined that [Oshman] had severe conditions as well as moderate limitations in social functioning." (Tr. 21-2.) Likewise, in May of 2015, a consulting examining expert, Dr. David Baker, evaluated Oshman and found that she experienced marked impairments in carrying out complex instructions and making complex work-related decisions; moderate impairments in her ability to understand complex instructions and make simple work-related decisions; and mild impairments in the ability to understand and carry out simple instructions. (Tr. 661.) Thus, without exception, these medical experts found that Oshman was significantly impaired due to her emotional disorders.

(Tr. 868-72).

Notwithstanding this substantial evidence documenting Oshman's longstanding mental impairments in the original ALJ decision her claim was denied at Step 2 of the sequential analysis governing Social Security claims, with the ALJ concluding that Oshman's well documented mental illnesses did not rise to the level

5

of a severe impairment. This Court concluded that the ALJ erred in dismissing this claim prematurely and ordered this matter remanded for further proceedings. (Tr. 863-84).

On remand, Oshman—an individual with a documented mental health history spanning decades marked by episodes of severe impairment—elected to try to represent herself. Thus, on January 14, 2020, Oshman appeared for a second disability hearing before an ALJ regarding her claim that her mental impairments prevented her from working. (Tr. 750-92). Recognizing that Oshman suffered from longstanding mental impairments, the ALJ engaged in a colloquy with her regarding her right to representation and assistance of counsel in an attempt to confirm a knowing and intelligent waiver of counsel by the plaintiff. (Tr. 750-58). Despite this conscientious effort by the ALJ, the colloquy with Oshman left more questions than answers concerning whether this mentally impaired claimant was making a knowing and intelligent decision to forego the assistance of counsel.

For example, it was apparent that Oshman had no clear idea concerning the nature and scope of the hearing. Thus, when the ALJ stated that this hearing was being conducted following the remand of her case, Oshman replied: "I'm not really sure what remanded from the Federal Court means." (Tr. 755). Oshman was also confused regarding the duration of the hearing, (Tr. 756), needed assistance in filling

out the waiver form, (Tr. 756-57), acknowledged that she had not reviewed her case file, (Tr. 757), and when asked if she would like to supplement the factual record provided the following confused response: "I'm not sure if I should say yes or no." (Tr. 758).

Given this profound uncertainty on Oshman's part, the ALJ concluded that additional medical records should be requested. (Tr. 760). These medical records, once obtained, confirmed that Oshman's on-going mental health diagnoses continued through 2019, the prescribed period of her disability claim, noting that she suffered from psychosis and substance abuse disorders. (Tr. 1013); These treatment notes also described Oshman as a poor historian and tangential in conversation, considerations which further cut against her acting as her own advocate. (Id.)

It is on this record, marked by Oshman's confusion and lack of understanding regarding the fundamental nature of the agency proceedings, the plaintiff waived her right to counsel and proceeded *pro se*. In the course of the hearing, the ALJ then endeavored to explain the sequential analysis which applied to disability claims to Oshman, but it seems that she did not understand since her own summary of this process was: "So I go through all the steps and at step five, so I could work somewhere, then I'm going to be denied?" (Tr. 764). As the ALJ and Oshman engaged in their colloquy her continued confusion was underscored by the fact that

7

she asked the ALJ to repeat the explanation of this process. (Tr. 766). The ALJ's repeated explanations concerning the nature of the process, were then met by an enigmatic reply from Oshman who stated that she "guess[ed]" that she understood. (Tr. 767).

Oshman's substantive testimony regarding her impairments was then marked by further profound uncertainty as she struggled to recall and recount her medications, treatment history, and symptoms. (Tr. 770-84). Beyond her shortcomings as a witness, Oshman played no active role at the hearing. She asked no questions of the witnesses and did not challenge the testimony of the vocational expert, stating instead: "Oh boy, I really don't have knowledge to what I should ask him." (Tr. 788).

Following this confused and flawed hearing, on April 10, 2020, the ALJ issued a decision denying Oshman's disability claim. (Tr. 732-45). In this decision, the ALJ first concluded that Oshman met the non-disability requirements for disabled widow's benefits under the Social Security Act. (Tr. 735). The ALJ further found that Oshman had not engaged in substantial gainful activity, and suffered from an array of severe emotional impairments, including schizoaffective disorder, depression, anxiety disorder, and alcohol abuse. (Tr. 736). At Step 3 the ALJ

determined that Oshman's mental limitations did not meet or medically equal the severity of one of the listed impairments. (Tr. 736-38).

The ALJ then arrived at a residual functional capacity (RFC) assessment for Oshman which found that she had no exertional limitations and could perform jobs in a low stress environment with only occasional contact with supervisors, co-workers, and the public. (Tr. 738). In reaching this RFC determination, the ALJ largely discounted Oshman's GAF scores, which reflected severe episodes of emotional impairment. The ALJ also afforded little weight to a 2015 consultative medical source opinion from Dr. David Baker, a physician who actually examined Oshman. (Tr. 742-43). Based upon his examination, Dr. Baker concluded that Oshman had marked impairments in her ability to carry out complex instructions and make complex work-related decisions. (Tr. 661). Dr. Baker also concluded that Oshman was markedly impaired in her ability to interact with co-workers and supervisors and has marked impairments in her ability to respond to usual work situations. (Tr. 662).

None of these opinions were given significant weight by the ALJ. Instead, the ALJ elected to afford greater weight to the five year old opinions of a non-treating, non-examining source in arriving at this residual functional capacity (RFC) assessment. (Tr. 743). Having arrived at this RFC assessment, the ALJ found at Step

5 that Oshman could perform work in the national economy and denied her disability claim. (Tr. 744-45).

Oshman then filed a *pro se* appeal of this ALJ decision. (Doc. 1). Oshman's litigation of this appeal further underscores her basic lack of understanding regarding the very complex disability determination process since her appeal is limited to a three-page letter request for receipt of benefits. (Doc. 18). While the Commissioner invites us on this record to affirm the ALJ's decision on its merits, (Doc. 9), upon consideration we must decline this invitation since we find that Oshman did not knowingly waive her right to counsel in these proceedings and was manifestly prejudiced by this uninformed choice. Therefore, we will remand this case for further proceedings.

### III. Discussion

#### A. Remand is Necessary in this Case.

In our view, the case presents several crucial threshold issues. The outcome of this appeal turns on our consideration of two pivotal and closely interrelated questions. First, did Oshman waive her right to counsel in a knowing and intelligent fashion? Second, did Oshman suffer any clear prejudice as a result of the decision to proceed to a hearing without the aid of counsel?

The legal benchmarks that govern waiver of counsel and the duties of an ALJ when dealing with an unrepresented claimant are familiar and well-settled. In this setting:

> Though a claimant does not have a constitutional right to counsel at a social security disability hearing, she does have a statutory and regulatory right to counsel at such a hearing. 42 U.S.C. § 406; 20 C.F.R. § 404.1705. The claimant must be given notice of the right to counsel and can waive this right only by a knowing and intelligent waiver. See, e.g., Smith v. Schweiker, 677 F.2d 826, 828 (11th Cir.1982). Moreover, where a claimant is *pro se*, the ALJ has a duty to help the claimant develop the administrative record and "must scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir.2003) (internal quotations omitted).Although an ALJ may deny a *pro se* claimant benefits, it is appropriate for a reviewing court to remand a case if there is "a showing of clear prejudice or unfairness at the administrative hearing." Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir.1979); see also Livingston v. Califano, 614 F.2d 342, 345 (3d Cir.1980) ("[I]f it is clear that the lack of counsel prejudiced the claimant or that the administrative proceeding was marked by unfairness due to the lack of counsel, this is sufficient for remand, or reversal."). A determination of whether the claimant waived the right to counsel knowingly and intelligently determines who has the burden of demonstrating whether remand is appropriate. As the Court of Appeals for the Seventh Circuit has explained, "[i]f the ALJ does not obtain a valid waiver of counsel, the burden is on the Commissioner to show the ALJ adequately developed the record." Skinner v. Astrue, 478 F.3d 836, 842 (7th Cir. 2007).

Vivaritas v. Comm'r of Soc. Sec., 264 F. App'x 155, 157–58 (3d Cir. 2008).

Thus, the threshold question we must address is whether Oshman waived her right to counsel in a knowing and intelligent manner. "Unlike other circuits, the

11

Third Circuit has not clearly defined a standard for what an ALJ must do to obtain a 'knowing and intelligent' waiver of a *pro se* claimant's right to counsel." Velez v. Comm'r of Soc. Sec., No. CV 17-02914 (RBK), 2018 WL 6787538, at *2 (D.N.J. Dec. 26, 2018). Thus following Vivaritas, courts in this circuit have "declin[ed] to adopt a 'rigid' approach that an ALJ must follow to obtain a valid waiver." Id. at *3 (collecting cases). However, there has been one consistent theme through these cases, which rests upon the fact that many Social Security disability claimants, like Oshman, suffer from mental impairments. Recognizing that these mental impairments may limit the ability of individual claimants to understand and knowingly waive their right to counsel, courts have repeatedly acknowledged that what might otherwise appear to have been an adequate colloquy may be insufficient to establish waiver by a mentally impaired disability claimant. See e.g., Vivaritas, 264 F. App'x at 161; Parker v. Berryhill, No. CV 16-271, 2017 WL 1022579, at *3 (W.D. Pa. Mar. 16, 2017); George v. Comm'r of Soc. Sec., No. CIV.A. 13-5179 FLW, 2014 WL 3955071, at *3 (D.N.J. Aug. 13, 2014).

So it is in this case. While the ALJ engaged in a conscientious colloquy with Oshman, in our view the results of that colloquy demonstrated that Oshman's mental impairments did not allow her to make a knowing and intelligent decision to forego her right to counsel. Quite the contrary, that colloquy underscores how Oshman's

12

decision to waive counsel was not made in a knowing and intelligent fashion. From the outset, Oshman displayed a profound lack of understanding regarding the important rights which he was surrendering. Thus, Oshman did not understand what the remand of her case meant. Nor did she appreciate how her claim would be evaluated. Further, she confessed an inability to pose intelligible questions to the vocational expert, and described a complete uncertainty regarding whether and how she could obtain medical records in support of her claim.

Simply put, at this hearing Oshman presented as a claimant who did not understand the role of counsel; who was unaware of the basic nature of the administrative hearing; who was unable to recall her mental status or medical history; and who was largely ignorant regarding the medical evidence under consideration by the ALJ. Given this constellation of considerations, all of which weigh against a valid waiver of counsel, we conclude that Oshman's waiver of her right to the assistance of counsel was not a knowing and intelligent waiver as required by law.

Having concluded that Oshman did not knowingly waive her right to counsel, we turn to the second question we must consider; namely, whether Oshman suffered any clear prejudice as a result of her decision to proceed to a hearing without counsel. On this score, we conclude that there is "a showing of clear prejudice or unfairness

at the administrative hearing" that stemmed from Oshman's unrepresented status which requires a remand of this case. Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979). Given the medical evidence presented here, which documented a decades-long history of mental illness, and the medical opinion evidence from a consulting examining source, which found that Oshman suffered from a series of marked mental impairments, counsel would have advanced Oshman's claims in a materially more persuasive fashion. In a counseled appeal additional treatment records could have been obtained, and further medical opinions could have been secured. These tasks, however, were entirely beyond Oshman's reach acting as her own counsel. Therefore, we conclude that Oshman has suffered potential prejudice as a result of this flawed waiver of counsel, prejudice which now compels a remand of this case.

Yet, while case law calls for a remand and further proceedings by the ALJ in this case, nothing in our Memorandum Opinion should be construed as suggesting what the outcome of that final and full analysis should be. Rather, that final assessment of the evidence must await a thorough consideration and development of this evidence on remand by an ALJ. Therefore, nothing in this Memorandum Opinion should be deemed as expressing a view on what the ultimate outcome of

any reassessment of this evidence should be. Rather, that task should remain the duty and province of the ALJ on remand.

## IV. Conclusion

For the foregoing reasons, the decision of the Commissioner in this case will be REVERSED and this case will be REMANDED for further consideration by the Commissioner. An appropriate order follows.

Submitted this 3d day of May 2023.

/S/ Martin C. Carlson  
Martin C. Carlson  
United States Magistrate Judge